May I please invite Theodore H. Frey for the evidence. This case raises a couple of questions that have been played versus Facebook's web token, but we think are thoroughly addressed by presidents and other speakers, such as Hank America, and Judge Easterbrook's and Jeff Kossner's opinions in Jerusalem and Pearson, and in the strict mind of a student, that is, and it ends with the wrath of that class council of undivided community alliances. With respect to the two major issues here, the first is, under what circumstances can there be a loss of price, and what does it mean for there to be an economically viable distribution possible? And the other is the scope of what sort of conflicts of interest or occurrence of conflicts of interest is permissible. The courts and parties ask for a definition of distributable that requires that every single class member get something, and therefore, because there are 130 million class members, a million dollars is a good distributable. One might agree that if this had to be distributable, 130 million class members, a million dollars would not be distributable, but that's not the legal standard and the standard that they're asking for. What effect might it earn if ratings for class action are dispersed into an all-separate settlement, and it's very rare that a settlement is consumed in class action settlements for more than a dollar per class member, and parties invariably rely upon a claims process to sort of throttle the amount of money that's going out to 110% of the class or more frequently 100% of the class. If you can open your argument with citation to a number of cases, do you have any case where it was determined by a circuit court, that the district court used its discretion in imposing a separate settlement on a finding that the settlement was not distributable? Yes, here's another sentence. I'm going to go through a sentence in D.A. It's an express issue with the residual separate distribution. Is there a case where there was a question about the recipient, the separate recipient? The separate recipient was challenged in the case. There are the residuals, $1.9 million. There's 13 million class members. The court held that Sly Gray has to be the last resort, and there's a pretty show of doing more interaction and getting money into the class. You know, in Rayman, that's exactly what happened. In America, is another case that called to the distribution of a residual if the money of $2.7 million was distributable to 100 of its remaining class members, even if it may not have been distributable to the entire class of any of the additional members. Pearson County seems quite distinguished in terms of their data. This is a much, much lower class where it's all at the address of its prior prescription holders. It knew how to find them. And if they're wanting to give us that little $3 coupon, it gave us that little $3 coupon that just doesn't seem close to what we've got here. But it's still, even if you just look at the identifiable class members, this $3.7, $4.7 million class members, and $1.1 million divided by $4.7 million class members, you're still $3 coupons, but only going to do less than 6, 7, 8, 9 residual class. And, again, is it yet not only viable to distribute money to 130 million class members if you have a claims process or even a lottery process? And I think no party has actually done that yet. But the fact of the matter is Frehley versus Facebook was 130 million class members, and they figured out a way to get millions of dollars to the class. And, in fact, the number of claims was so small that they increased the distribution from $10 to $15 and still had money left over from the $1,020 million fund versus an $8 million fund. But that still raises the possibility of distributing 6 or $7 million here. And they did, again, localize the voting box. They put in the disportion of value. The disportion of rejected settlement is inappropriate under 3.0. It's a 3.0 settlement because it's economically viable to do some sort of distribution to the class. And it has to be amounted. I'm sorry. It has to be distributed. I mean, the money has to be determined. So the amount of house that you contract or whatever, you create an $8 million common fund. You have a claims process. And, again, it's not really a claim process. Well, it costs a million dollars to do the settlement administration, in this case, without any distribution. Sorry. CEO, why are you paying to the class? I'll be really specific with my question. I know you've been here three times. I apologize for this. How do you contact 130 million people? The same way they contact them to notify them of the settlement you submit an email. The class may notice you. They get individualized notice. The question so far has been going to one point, but there's another area in here that I'd like to have your view on. And that's how the money was sent. That is, the recipients would be under cypress. It's clear there was a connection between the plaintiff's lawyers and the individual recipients. Well, there's something as clear as that. To make sure that the proper people who have been under car arrest is, I don't see any place where there's been a record made. They just had a conversation, but I didn't see any declarations. I didn't see any testimony. Was there any? There is not. The plaintiff made a certain legal argument, and I feel they've introduced a new record of evidence regarding the grant proposal that I had. We would argue that a grant proposal does not protect against this kind of conflict of interest. It's exactly a conflict of interest. It's basically that if you're a conflict of interest, there is a disparage. It has to do with spending money for common water. And I think in the agreement, both the argument below and by the recent 28th of January, they identified the Google Cookies as being part of a new mining and mining solution project, and you just quarantined the trace, the balance, as you put it, and that's fine. It sort of shows what was going on. It's the type of thing, it seems to me, when it's raised needs to be taken care of at the district court level. When it gets to us, it just looks odd, what they call a smell test or something. You wonder how the district judge made the determination that there was no influence by any of the plaintiff's lawyers into the determination of the recipients. And without any record, I just don't know how you make that decision. Well, there are two problems that the district court is facing. One, they improperly put the burden on the intermediaries to prove what was going on. Even though the burden rests with the moving party as it takes its own cameras in the case of Spitzley. And two, the court reasons. Well, some of the people in this settlement have connections to Harvard, but not all of them did because it was an negotiated settlement. The presence of non-Harvard people and non-Georgia people in the settlement negotiations immunized the sludge. And I think that's clearly a wrong use of the phrase abuse of discretion in Harvard. Well, this is based more on an abuse of discretion standard, is that right? We are under an abuse of discretion standard, but on the wrong standard of law, it's an abuse of discretion to make that argument. And I think the district court's abuse of discretion given the negative fragments of the relationship with the parties in the phase of the bankruptcy. Yes. I didn't tell you about my problem with the claim that there is this relationship. It's not random that these particular universities were chosen because they have the kind of centers that are relevant here. And of course, given the number of lawyers that have gone to some of these schools, like Stanford and Harvard, et cetera, I think that simply saying that you should submit what you're on the water, I don't see how that's enough of a connection to be viewed as conflict. Do you have something more that we should be looking at? Well, we have the 3.07 standard. We have the precedent of caution, which specifically smooths out that particular kind of conflict. And even the district court below said that that's not a creation you could use for alumni fundraising. And why it didn't follow up on that, and it's actually OK, and I'll get into that more when I have the hearing. It was very critical about the substance of the cases. There's the instance of sort of the spill test and that there was a lack of transparency in the selection process. And again, in terms of raising substantial questions, substantial questions were raised about these recipients in a 2012 Fortune article because it's the usual suspect that Google gives money to a piece of organization that Google already gives money to and works with and that generally support Google on most of Google's issues. And this was raised in an article in 2012 while me going through the case. And 3.07 is the right standard. I think that creates the substantial questions necessary to find the recipients are relevant. And Dennis identifies that too, where the defendant, right here, leads into one of these three particular inferiority. The fact that this moment requires that sort of intonation, that's just a shift in common interests. So I put Dennis first. It's a good look. Call the paper. It's a good look. I think Dennis is in a court that's adopted 3.07, a circuit court of appeals. And that's the CRCT jury society, favorably. Bank of America, they said it's favorably. It's already is. But is there anything more than that? And this is when you meet the standard. Bank of America, I don't know if this is in 75, but if there is, just see what they said. We're adopting 3.07. Is that a circuit? That's the answer. I'm well-inspired about all time. And I look forward to further questions. May it please the court. Good morning, your honors. Joshua Nazeri for plaintiff and pally. I'd like to pick up where the conversation just left off. Oh, by the way, I'll be taking about seven and a half to ten minutes, and then Mr. Falk will stand up. Judge Wallace, you asked whether there was a record that pertained to the alma mater question. And I'd like to direct you to excerpt from pages 6 and 49, both myself and Michael Aschenbrenner declared, submit declarations saying that, yes, these law schools were our alma maters, but that they had no current affiliations with law schools nor desires within them. Yeah, I understand that. But was the same written declaration or a stated declaration? Both, your honor, we submit written declarations on final approval. And at the fairness hearing, your honor, I believe I also stated before the hearing that there are written declarations that are done on final approval. OK, so. Which have not been challenged, your honor. Well, Mr. Johnson, you say there's no current. You might say, but there's no current connection. It specifically does not cover past contacts. And I'm just wondering why there was not more done by the court. This is very important. Millions of dollars at stake. And they just seem to go to alumni of council. I'm not saying there's more. I'm just saying there should have been more of a record by the district court. So, your honor, if I may, the record before the district court versus Judge McEloy recognized even the district court called these recipients the usual suspects. This is a relatively narrow field. Populated largely with law schools and especially with the law schools. They can do the kind of work in the privacy field to have a track record that's required under this court's precedent. So there aren't that many to choose from to begin with. In addition to that, your honor, I don't find a conflict between ALI viewing 0.07 of this court's standards. And not standard is set forth. It's very consistent with the comment in 3.07, which says there should be a selection of the cipher recipients should be on the merits. That's what page 3.07 says. And actually it says it should be tied to this statute and should benefit the absent class members. Well, here, your honor, we had over 100 pages of specific and detailed proposals which were crafted specifically in response to this lawsuit and to benefit the class members. What I believe is unprecedented in this period of time in getting insight for any of these elements is the court had over 100 pages of proposals before it. 100 pages of proposals? By whom? By the six recipients that the people who made the final decision on it. Not proposals by all of the people who might be involved, but by the six that had already been designated as the proposed recipients. Subject to the district court's approval, your honor, if any of them had not passed, most of them would have dropped out, and there would have been five remaining or four remaining as the case may be. But the class that the district court had to look at was already down to the ones who were alumni of the attorneys involved. There wasn't any opportunity for others to become involved to be considered in a hearing by the district court. Correct, your honor. Three of the six were alumni. Three, the other three were not. And this was, there was a lively discussion here, your honor, in the North Carolina area where they had a final approval. The district court did lament the fact that there wasn't an opportunity to bring in new players. It's me who's the one that talked about the smelling tips. I didn't bring that up myself. And when the district court finds that, the question really is, was there enough done to protect the people who are not going to get the money, the class people? Is this an appropriate use of their money? And was there factual findings made to that extent? So the real question is, isn't this a discretion issue? But really, the question is, how much should be done? This is a new ballgame over the last couple of decades. And we need to make sure that all of the entrants are protected. And that's why I'm raising the question. I'm not criticizing anybody. Your honor, a couple of observations. First, the fact that the district court raised the question. I wish the court would have used a different language, but I raised the question. Well, it's indicative that this is not a rubber stamp process. The court spent a lot of time on campus and put us across. The other thing is, I don't know what more can be done, your honor, or that anymore has ever been done in a case like this to determine the selection of recipients for common merits. Again, I look at our pages. Plus, I've never seen anything like that before. And there was objective things, essentially, asking the court to find that an alma mater, no matter how qualified, should be disqualified from the general. And that doesn't conform with any case law, including NAWQA. Your honor, there is a statement in NAWQA about all the honors. But let's put it in context. What NAWQA says is when you don't follow our guidance of ensuring that your recipients are going to spend the money with and promotes the objectives of the statute and benefits the class members, if you don't do that, then there's a risk that you're opening up a special process to the lawyers and counsel of the court. And that's not our case, your honor. Mr. Frank also brought up the point of why he didn't try to get more money to the class as distinguished employee with a side price. And of course, that is your responsibility. I'd like to hear your response to that. Why was there not some way to get additional funds out to the class as distinguished employee with a side price? Yes, your honor. First, I'll admit that Judge Frank has not contested the $8.5 million amount that he says should have been more. What he does say is that we should have made direct distributions. I'd like to correct the record before the court today. There was not individual email notice in this case. And to Judge Ivey's question, how do you get notice up to 103 million people? Well, the only way to do that when you can't identify them and you don't have a database is by publication. You should just look for subscribers of Google's. Two of them may be, your honor, but not all of them. They're not specifically users. Correct. Does it look like Google specifically posted something for when you go to Google? It was saying, attention, if you think you can use search services between these days  Yeah, press the button. And Google sent you $0.45. I don't know if the $8.5 isn't. I mean, we can make this really, really easy. But at that point, then, you're sending $8.5 million over $135 million, over 130 million people. Right, which if there were no distribution notice, your honor, that's 0.4 cents a person. And the other thing is that Objector Frank says, well, the district court erred as a matter of law by not distributing money. Frankly, it's the proof. But there are some critical differences. First, the fund was much bigger. Objector Frank noted it was $20 million. And after attorney's fees and distribution costs, it was still more than $10 million. The size of the class was smaller. Importantly, in that case, Facebook was the defendant. And Facebook had a database that both identified the class and had contact information for the class. And in that case, notice went out by email. That's quite different than our case, where, as we've just discussed, it's hard to identify the class. And notice would have to go out by publication. We don't know how many of the class members would be Google subscribers compared to the overall class. We do, your honor. Right. Unless the court has any further questions for me, I'll yield. Thank you. Thank you. Thank you. Well, your honor, don't fall for Google. There's a lot that's not an issue here. And that ranges from the amount, which is, as Frank said, $508 by a factor of 4. There's grave risks. It's most important to argue there's grave risks. Not standing liability, class certification, and damages in various circumstances that make this the type of case where a scientific relief is particularly appropriate. It's not a case where you have a record of individualized injury. In fact, in a class-wide Google injury hangout situation, that was one of the most strongly contested issues in the case, was whether anyone had been hurt by this at all. Now, there are grave risks. If you don't have a table on all these issues, you're looking at a lot of money. So risks that the plaintiff has to be able to compromise in some sensible way. And in this case, this is not the run-of-the-mill case. But in this case, where you have exactly those risks to be compromised makes particular sense. And there is less of an issue with individuals who are actually provably hurt being somehow shorted. Now, I think one of the ways you can analyze this is the remarkably low lockdown rates here in 2013, as opposed to several thousand in Italy and in Plain. It doesn't prove everything, but it does indicate that there aren't a lot of people out there who thought they were hurt and weren't going to be compensated. And then I think that's a big difference between people's personal purchases or for all to see. You had some people there that were really hurt. You don't have that here. It's also, I don't think, reasonably disputable that the distributees or the recipients were targeted in a way that would respond, ensure that their funding responded to exactly the harms that were alleged here. I don't think they can be proven. They're on what was alleged here, and it had to do with privacy, and it also had to do with prior and end privacy in a way that was responsive to education. And I'll explain why the whole theory of this case was that people were entering things in their search field that, if you follow a long enough cost chain, would reveal things about them that maybe they didn't want to be revealed to the people that, you know, from time to space, they clicked. And if you learned that, you know, that's a risk, then maybe you don't, you know, put your name or social security number and a bunch of other data in the search field, at least without taking additional precautions to make sure that data isn't transferred. And those precautions and information are part of the injunctive relief here. And Mr. Franklin replaced programs that really comment this issue, this privacy issue, this specific issue here, from several directions, from education, from policy research, looking at what kind of legislation will work, and even technical research. Carnegie Mellon's proposal, which is the supplemental excerpts, and those, although Mr. Frank derides those, the court read them, he said so, page 44 of the excerpts, and they are what really limit what can be done and ensure that what is being done here is particularly responsive to what the class is interested in and what the statutes are supposed to protect. The question is, who can speak for the class? Now, the attorneys, plaintiff's attorneys at this point have already gotten their fee. They're not going to make any more money by this process. Google has made an extremely shameless willing to pay, so they don't have a particular responsibility to the class. There are ways of doing it, appointing separate attorneys of the class and let the attorney objectively take a look at it. There's a lot of money in the pot. So what I'm suggesting, the question that we have to answer, was enough done here to be sure that the class whose money we're using got to the right place and was not interfered with by the people who are paying or the people who are receiving. I'm not sure that merely because attorneys no longer have a relationship with any unit or, on the other hand, if these claim to be Google recipients, there's three of them on Google. I'm not sure without some type of independent hearing that we're really protecting the people whose money it is, and that's what I'm struggling with. Now, maybe there's no way you can do it, but this is not going to stop. This is a train that's on the tracks. We're going to see more of these cases, so it's a good time for us to look at it. I'm not being critical of anyone, you understand. I'm trying to look at fairness in the process. Well, it's your job to be critical sometimes, Your Honor, so I don't mind you're doing that, but I think the records here, the applications here, are in much greater detail than certainly laying where you had a one-sentence mission statement. And that'll tell. I certainly didn't know where the money was going, because there was a one-sentence mission statement that might connect to the donations to the recipients. My problem here is that it's the attorney for the plaintiffs and the attorneys for the defendants that are bringing the proposal in, and there's no one at that point speaking for the people whose money it is. It's going to be spent. So there's a hitch in the usual fairness that we have that the people whose millions of dollars are involved are not represented. I don't know a way around that. Well, I think the plaintiffs, the plaintiffs attorneys have been negotiating a settlement or a line full of their dues to the class, and if I could just make two very quick points, and then I'll sit down about the notion that these were regular Google recipients. Stanford certainly has been a recipient, but not for piety, and that's what Stanford said, and that was discussed in the records of 1991 in the supplemental excerpts of the application in 333-31. In fact, Stanford's research was used by the FTC to bring a case against Google, and Google, who brought that case, was the complainant. The World Price Forum was the complainant in that case, as they say at page 367 of the supplemental excerpts. The others at pages 257, 283, 293, and 313, the largest donation given to the other four recipients was about $300,000. Now you're looking at a billion. Privacy goes on. I think the objection here shouldn't be, and if it is, it would be misplaced, that the directed funds didn't have a direct relationship to the subject. That seems fairly clear here. It wasn't just a donation to Stanford for some kind of fund. It was to a specific center at Stanford or to the Berkman Center, etc. The question is, as 3.07 says, is there any significant prior affiliation that somehow, even with that direct connection, would undo it because there's an appearance of impropriety or an appearance of conflict? So that seems to me to be the question that we have to answer, and do you have anything further that suggests that simply by being someone's alma mater that that's not significant? Or do we have any guidance on that? Well, the question is whether it raises a significant substantial question as to whether the selection was made on the merits. And I think the application process, the reputation of all these places, but particularly the application process and the commitment to use these funds in a particular way that's not going to help Google in the sense that things like Google may improve Google's practices, and that's functional. What if one of the attorneys was on the board of one of these universities? Would that be enough to be in squabbling there? These are all factors, but I think to accept that abstract question, I mean, the fact that Mr. Frank says it as a question doesn't mean it's a substantial question or whether the selection was made on the merits. My question was not Mr. Frank's objection. My question was, in your view, if one of the attorneys served on the board of one of these institutions, would that be disqualifying in evidence? I don't know that it would be automatically disqualifying. We don't have anything resembling that here. We don't have that kind of state relationship or even the loose relationship that was found to be not sufficient to bar a donation on this large report for a public interest organization. I think if it was an organization that maybe had a board of five people in place, Council was one of the five people for the particular directed recipient. I would raise that. I would raise substantial questions. It would take a lot to rebut that. We have a lot less here, and we've reputted it here in our... Thank you. Spoken with. This court is very deeply rejected and has retained a levy requirement for class reunification, and it's perfectly okay for class members to identify themselves with declarations or state that's interrelated to a perjury. There's no requirement that every single class of Berkeley known to the institutions, all class, but for a certificate exam requirement, this court will reject it.  So the idea that, well, we have a bill with 130 million people on it doesn't excuse the possibility of a distribution, and they acknowledge under Fraley that they're able to distribute 15 dollars per cleaning class member with a $10 million fund. So you have a $60 million fund here distributing $6 for a cleaning class member or something, and that would be pro rata after a million dollars or so. And if you go online, the cleaning costs would be clearly less than a million dollars. I apologize on the confusing legal cookies where I didn't get an individual answer as to this point. But the fact that there was a publication notice, the court found that that satisfied the process. There's no reason that that's the excuse of the publication notice would not satisfy the cleaning services. I think I've made it very much clear to address the questions you're looking at. Are there more questions? I think I want to throw in one other point, that Google makes the argument in its brief that they would have preferred giving the money to the charities rather than giving the money to the class, and that's the whole nature of compromise, but I think that just goes to show that this is not worth $6 million, this decree is not worth $6 million in benefits to the class, especially students, class member, or any individual benefits, whether or not they're a class member, whether or not they opt out. In fact, the rational thing for a class council looking out for the interests of the class members would be to instruct every single class member to opt out, because then they keep their plain or inventory, Google says it's feudal, and it's settled for a feudal member. So these are two things, but I just didn't want to instruct for a feudal case. In any event, I think I've answered your questions, and I think that we've exhausted our questions for all councils, so thank you very much, and the case of House v. Google is submitted. Thank all council for coming, and for your arguments today. One last piece of the calendar, Padilla-Ramirez v. Riley.
judges: Wallace, McKeown, Bybee